[No. C008319. Third Dist. July 26, 1991.]

AL-SAL OIL COMPANY, INC., Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**COUNSEL**

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, and Jack Newman, Deputy Attorney General, for Defendant and Appellant.

Latham & Watkins, Thomas G. Bost and David S. Raab for Plaintiff and Respondent.

**OPINION**

**DAVIS, J.**—In this tax refund action arising under the Motor Vehicle Fuel License Tax Law (Rev. & Tax. Code, § 7301 et seq.), the State Board of Equalization (Board) appeals from a judgment in favor of the taxpayer, Al-Sal Oil Company, Inc. (Al-Sal). ▇ The issue is whether Al-Sal was required to pay an excess gallonage tax—applicable to licensed distributors —on its retail sales of straight gasoline during the time it sold such gasoline and blended and sold gasohol. We agree with the trial court that Al-Sal was not required to pay this tax and we therefore affirm the judgment. In arriving at our conclusion we have been forced to make our way through a legislative scheme to simplify state taxation of the gasoline industry. The exercise calls to mind words by U.S. Congressman Delbert L. Latta when confronting a similar scheme: "I hold in my hand 1,379 pages of tax simplification." (On tax reform, quoted in U.S. News & World Report, Dec. 23, 1985.)

## BACKGROUND

### *The Motor Vehicle Fuel License Tax Law*

In 1941 the Motor Vehicle Fuel License Tax Law (hereafter, Fuel Tax Law) was enacted, replacing the 1923 Gas Tax Act. (See Rev. & Tax. Code, § 7301, 60 West's Ann. Rev. & Tax. Code (1987 ed.) Historical Note, p. 694; § 7305, Code Commission Notes.) The Fuel Tax Law imposes a license tax upon "distributors" for each gallon of fuel they distribute. (Rev. & Tax. Code, §§ 7351, 7306; further reference to undesignated sections are to the Revenue and Taxation Code.) A distributor includes every person who "distributes" motor vehicle fuel within the meaning of section 7305. (§ 7306) Section 7305, in subdivisions (a) through (d), defines "distribution" as being comprised of two distinct elements: (1) a "producing, etc." or an "importing" or a "receiving" element; *and* (2) a "sale" or a "use" or a "delivery" element. Thus, under section 7305, subdivision (a), "distribution" is defined as the *producing, refining,* or *blending* of motor vehicle fuel in California, *and* the *sale* or *use* of the fuel in the state. Subdivision (b) has a similar first element, but, among other things, has a different second element: *delivery* of the fuel. Subdivision (c) of section 7305 defines "distribution" as the *importing* of motor vehicle fuel into California, *and* the *sale* or *use* of the fuel in the state. Under subdivision (d), "distribution" means the *receiving* in California of motor vehicle fuel for which there has been no prior taxable distribution, *and* the *sale* or *use* of the fuel in the state. The last subdivision of section 7305 substantively defining "distribution," subdivision (e), specifies in pertinent part: "The withdrawal of motor vehicle fuel from storage in this state for the purpose of the sale . . . or use of the fuel in this state if the consummation of that purpose does not otherwise constitute a distribution taxable under [the Fuel Tax Law] . . . ."[1]

---

[1]Section 7305 reads in its entirety: " 'Distribution' includes any of the following: [¶] (a) The refining, manufacturing, producing, blending, or compounding of motor vehicle fuel in this state, and the sale, donation, consignment for sale, barter, or use of the fuel in this state. [¶] (b) The refining, manufacturing, producing, blending, or compounding of motor vehicle fuel in this state from petroleum products owned by another and the delivery of the fuel in this state to the owner thereof or to any person on his or her order. [¶] (c) The importing of motor vehicle fuel into this state, and the sale, donation, consignment for sale, barter, or use of the fuel in this state unless the state is prohibited by the Constitution or laws of the United States from imposing a tax with respect to that sale, donation, consignment for sale, barter or use; provided, however, that motor vehicle fuel brought into this state in the usual and ordinary fuel supply tank connected to the engine of a motor vehicle shall not be deemed to be 'imported' if not removed from that tank except as used for the propulsion of the engine, except to the extent that fuel was acquired tax free for export or a refund of tax was claimed on account of exportation from the state from which that fuel was transported into this state. [¶] (d) The receiving in this state by a licensed distributor of motor vehicle fuel with respect to which there has been no prior taxable distribution, or the receipt in this state by any person,

■ Therefore, under subdivisions (a) through (d) of section 7305, a mere sale of fuel does not constitute a taxable "distribution"—the taxable event occurs when a production, or an importation, or a qualified receipt of fuel is coupled with a sale. (§ 7305.) Under subdivision (e) of section 7305, the "distribution" occurs when the fuel is withdrawn from storage for the purpose of sale if that sale does not otherwise result in a taxable distribution. As a result, most deliveries of motor vehicle fuel are taxed only once: under subdivisions (a) through (d), the first time the fuel is sold after having been produced or imported or received; or, under subdivision (e), when the fuel is withdrawn. (§§ 7305, 7354.) This principle is expressed in section 7354, which states that the license tax is generally imposed upon only one distribution of the same motor vehicle fuel.

There is an exception to this principle, however. Motor vehicle fuel expands at warm temperatures and contracts at colder ones. As a consequence, the volume of fuel sold by a retailer (the term "retailer" is used in its ordinary sense) may be smaller or larger than the volume acquired tax-paid from a distributor. If such expanded fuel is sold at retail, no additional tax liability is generally incurred. If such expanded fuel, however, is in some way "redistributed" by a distributor or a broker, sections 7356 and 7356.5 impose a license tax on the volume of redistributed fuel that is greater than the volume of tax-paid fuel taxed in the initial distribution. This is known as the "excess gallonage" tax.[2] The amount of "excess gallonage" is calculated

---

other than a licensed distributor or licensed broker under the conditions set forth in paragraph (5) of subdivision (a) of Section 7401, of motor vehicle fuel with respect to which there has not been a prior distribution on which tax has been paid pursuant to this part, and the sale, donation, consignment for sale, barter, or use of the fuel in this state. [¶] (e) The withdrawal of motor vehicle fuel from storage in this state for the purpose of the sale, donation, consignment for sale, barter or use of the fuel in this state if the consummation of that purpose does not otherwise constitute a distribution taxable under this part, in which event the license tax with respect to the fuel withdrawn from storage is measured by the gallonage thereof thus sold, donated, consigned for sale, bartered or used. [¶] (f) For the purpose of subdivisions (a), (c), (d), and (e), 'consignment for sale' does not include the withdrawal of motor vehicle fuel from storage and the transfer of the fuel into storage at a bulk plant operated by an agent acting in a representative capacity for and on behalf of the distributor for the distribution of that fuel when title to, and control of, the fuel remains in the distributor until it is distributed, and all distributions by the agent are made in the name of, and for the account of, the distributor, notwithstanding that the agent may under the conditions of his or her agency agreement with the distributor be considered an independent contractor with respect to the operation of the bulk plant."

[2]Section 7356 provides: "Any distributor or broker who acquires motor vehicle fuel from another distributor under a taxable distribution measured by the temperature corrected gallonage as provided in Section 7355, or by volumetric measure, and who redistributes the fuel is subject to the tax imposed by this part with respect to that gallonage redistributed which is in excess of the taxable measure of the gallonage acquired."

Section 7356.5 provides: "Any distributor or broker who acquires taxpaid motor vehicle fuel from another distributor or broker measured by the temperature corrected gallonage as

either by simply comparing the different fuel volumes at issue or by comparing the distributed, tax-paid volume measured on a temperature-corrected basis (that is, the volume is measured by assuming the fuel was delivered at a temperature of 60 degrees Fahrenheit—see § 7355) with the actual expanded volume redistributed at temperatures above 60 degrees. (§§ 7355, 7356, 7356.5.)

## The Facts of This Case

Al-Sal is a family owned and operated company that owns retail self-service gasoline stations in Southern California. From the date of its incorporation, September 1, 1971, until July 1, 1982, Al-Sal never incurred any tax liability under the Fuel Tax Law. On July 1, 1982, Al-Sal obtained a distributor's license under section 7451 to blend gasoline and alcohol to produce gasohol for sale at some of its service stations. (Distributor licenses are issued generically to any person who is a distributor; these licenses do not correspond to any particular distribution activities. (§§ 7451, 7305.)) Al-Sal held its distributor's license until January 31, 1985.

To produce the gasohol, Al-Sal would hire trucking companies to drive to refineries or distribution centers and fill each truck with approximately 8,100 gallons of gasoline. Each truck then proceeded to an alcohol distribution center and added about 900 gallons of alcohol. After this, the trucks drove to retail service stations owned by Al-Sal; in the process, the gasoline and alcohol were blended in the tanks of the trucks. The trucks then deposited the gasohol in underground tanks connected directly to gasohol pumps for retail sales to Al-Sal customers. The gasoline used in this process was purchased on a tax-paid basis; the alcohol was not. During the period Al-Sal held its distributor's license, gasohol sales comprised 10 percent of Al-Sal's total retail motor vehicle fuel sales.

At all relevant times, Al-Sal sold straight gasoline at its retail service stations. To obtain this gasoline, Al-Sal would hire trucking companies to drive to refineries or distribution centers and fill each truck with approximately 9,000 gallons of gasoline. The trucks then proceeded to stations owned by Al-Sal and deposited the gasoline into underground tanks

provided in Section 7355, or by volumetric measure, and who redistributes the fuel is subject to the tax imposed by this part with respect to that gallonage redistributed which is in excess of the taxable measure of the gallonage acquired taxpaid. For the purposes of this section 'taxpaid' means the gallonage, either temperature corrected or volumetric, with respect to which the tax imposed by this part has been paid prior to acquisition by the distributor or broker."

"Broker" is defined in section 7308: " 'Broker' includes every person, other than a distributor, dealing, either as the owner or as the agent of another, in motor vehicle fuel. 'Broker' does not include anyone dealing in such fuel only: (a) in quantities of less than 200 gallons, (b) as an operator of a service station, (c) as an agent for a distributor in the operation of a bulk plant in the manner described in subdivision (f) of Section 7305."

connected directly to gasoline pumps for retail sales to Al-Sal customers. All of this gasoline was purchased tax-paid on a temperature-corrected basis. (See § 7355, subd. (e).)

In conducting an audit, the Board determined that during the time Al-Sal held its distributor's license—that is, from July 1, 1982, to January 31, 1985—Al-Sal was liable under sections 7356 and 7356.5 for tax on that part of its retail sales which reflected the expansion of fuel due to warm weather. The Board assessed this tax on both Al-Sal's gasohol sales and on its straight gasoline sales. Specifically, the tax on Al-Sal's straight gasoline sales was assessed by comparing the volume of gasoline Al-Sal bought tax-paid on a temperature-corrected basis (this volume was measured as if the gasoline had been delivered to Al-Sal at a temperature of 60 degrees Fahrenheit) with the expanded volume actually sold to retail customers during warmer weather. This tax was assessed only during the period that Al-Sal held its distributor's license. Both before and after that period, Al-Sal sold straight gasoline through its service stations without incurring the tax. In fact, the Board's auditor advised Al-Sal to relinquish its distributor's license to a related entity to prevent the tax assessment, which Al-Sal did with the advised effect on January 31, 1985.

Al-Sal concedes the "excess gallonage" tax under sections 7356 and 7356.5 is applicable to its gasohol sales because it *blended* gasoline and alcohol—by adding nontaxed alcohol to gasoline—*and sold* the blend as gasohol. (See § 7305, subd. (a).) Al-Sal disputes that its straight gasoline sales were subject to the excess gallonage tax during the period Al-Sal held its distributor's license from July 1, 1982, to January 31, 1985.

## DISCUSSION

■ The Board posits two alternative bases for imposing the "excess gallonage" tax on Al-Sal's retail sales of straight gasoline during the time Al-Sal was a licensed distributor. First, the Board contends that "distribution" as defined in section 7305, subdivision (e), provides the definition for the term "redistributes" in sections 7356 and 7356.5. Alternatively, the Board contends the term "redistributes" in sections 7356 and 7356.5 is to be given its ordinary meaning of placing in the stream of commerce and does not mean the same thing as "distribution" in section 7305. Neither of these contentions has merit. As we read the statutory scheme of the Fuel Tax Law, it provides no basis upon which to impose an "excess gallonage" tax on Al-Sal's already tax-paid retail sales of straight gasoline during the time Al-Sal held a distributor's license to blend and sell gasohol.

■ The interpretation of a statute presents a question of law which we determine independently. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal,

§§ 241-242, pp. 246-247.) Certain rules of construction guide our interpretation. The fundamental rule is to ascertain the Legislature's intent so the purpose of the statute is effectuated. (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898 [276 Cal.Rptr. 918, 802 P.2d 420].) In ascertaining legislative intent, we read the words of the statute according to their "usual, ordinary, and common sense meaning" consistent with the statute's apparent purpose; we avoid any reading that results in absurdity. (*In re Rojas* (1979) 23 Cal.3d 152, 155 [151 Cal.Rptr. 649, 588 P.2d 789]; *In re Head* (1986) 42 Cal.3d 223, 232 [228 Cal.Rptr. 184, 721 P.2d 65]; 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 94, pp. 146-147.) Consequently, if a statute can be interpreted in more than one way, we adopt the reasonable meaning and reject the one leading to an absurd result. (*People* v. *Clark* (1990) 50 Cal.3d 583, 605 [268 Cal.Rptr. 399, 789 P.2d 127].) Even if the statute's language is clear, it " 'should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' " (*Pieters, supra,* 52 Cal.3d at pp. 898-899, quoting *Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 113 [145 Cal.Rptr. 674, 577 P.2d 1014], citations omitted.) Finally, we give significance, if possible, to every word or part of the statute, and harmonize the parts by reading them in the context of the whole. (7 Witkin, Summary of Cal. Law, *supra,* Constitutional Law, § 94, p. 147.)

With these principles in mind, we begin our interpretive analysis by construing section 7305, subdivision (e).

*Section 7305, Subdivision (e) Does Not Provide a Basis for Imposition of the Tax Here*

Section 7305, subdivision (e) (hereafter, section 7305(e)) defines "distribution" as "[t]he withdrawal of motor vehicle fuel from storage in this state for the purpose of the sale, donation, consignment for sale, barter or use of the fuel in this state if the consummation of that purpose does not otherwise constitute a distribution taxable under this part, in which event the license tax with respect to the fuel withdrawn from storage is measured by the gallonage thereof thus sold, donated, consigned for sale, bartered or used."

According to the Board, this definition of "distribution" provides the basis for imposing the "excess gallonage" tax on Al-Sal's retail sales of straight gasoline during the time Al-Sal was a licensed distributor. Under the "excess gallonage" tax set forth in sections 7356 and 7356.5, a licensed distributor or broker who "redistributes" tax-paid fuel is liable under the Fuel Tax Law for the volume of redistributed fuel that is greater than the volume of tax-paid fuel. (See fn. 2, *ante.*) The Board's legal theory is that

Al-Sal, as a licensed distributor, withdrew straight gasoline from its underground tanks at its retail service stations for the purpose of sale to Al-Sal customers. The Board asserts the term "storage" in section 7305(e) is to be accorded its plain meaning and therefore encompasses storage in underground fuel tanks at a retail service station. The consummation of such retail sales does not otherwise constitute a distribution taxable under the Fuel Tax Law, argues the Board, so the plain terms of section 7305(e) furnish the definition of "redistributes" and therefore the legal basis to impose the "excess gallonage" tax here.[3]

As we explain, the Board's interpretation of section 7305(e) is erroneous.

The fundamental problem with the Board's interpretation is that it would transform all mere retailers of motor vehicle fuel into distributors subject to the Fuel Tax Law. To make a retail sale of motor vehicle fuel, the fuel must be withdrawn from some container for the purpose of sale. Since such a withdrawal and sale would not otherwise constitute a taxable distribution (see § 7305, subds. (a)-(d)), it would come within section 7305(e) as interpreted by the Board. It is recognized, however, that mere retailers are not subject to the Fuel Tax Law. (See §§ 7305, 7306, 7308, 7351, 7354, 7356, 7356.5.) The Board's expansive interpretation would run roughshod over the basic premise of the Fuel Tax Law, which taxes "the privilege of *distributing* motor vehicle fuel," not the privilege of *retailing* it. (§ 7351; italics added.) What constitutes "distributing" is defined specifically in the Fuel Tax Law, and that definition does not encompass mere retail sales. (§ 7305.) Under the Board's interpretation, the basic principle that the fuel tax is generally imposed upon only one distribution of the same motor vehicle fuel would be rendered meaningless. (§ 7354.)

Furthermore, the Board's reading of section 7305(e) would subsume all of the other definitions of "distribution" set forth in section 7305 and therefore lead to absurd results. As we have seen, subdivisions (a) through (d) of section 7305 define "distribution" as encompassing a "producing, etc." or an "importing" or a "receiving" element *coupled with* a sale ele-ment. But under the Board's expansive reading of section 7305(e), a mere sale, in and of itself, would be subject to the tax because necessarily preceding any sale would be some kind of withdrawal from storage. Consequently,

[3]This section 7305(e) argument was the Board's principal argument at trial. On appeal, however, the Board relies primarily on the argument concerning the plain meaning of the term "redistributes" in sections 7356 and 7356.5. In fact, the Board on appeal raises the section 7305(e) argument in its reply brief only. Al-Sal moved this court to strike the Board's section 7305(e) argument for this reason. We denied this motion because the argument was fully briefed and litigated below and it involves a question of law. (See *Adelson* v. *Hertz Rent-A-Car* (1982) 133 Cal.App.3d 221, 225-226 [183 Cal.Rptr. 779].)

the concept in subdivisions (a) through (d) of section 7305 that *mere* sales do not constitute "distributions" would be rendered irrelevant. Under the Board's reading of section 7305(e), the qualification specified in that provision—"if the consummation of that purpose [that is, the sale] does not otherwise constitute a distribution taxable under this part"—would *always* apply and would therefore no longer be a qualification. In fact, the Board's reading of section 7305(e) would render the "withdrawal" element of that provision irrelevant as well: again, all sales must necessarily be preceded by some sort of withdrawal. This expansive reading of section 7305(e) is incompatible with the intent of section 7305 in general and the intent of section 7305(e) in particular.

Section 7305 was enacted as part of the original 1941 Fuel Tax Law, which replaced the 1923 Gas Tax Act. (§ 7301, 60 West's Ann. Rev. & Tax. Code (1987 ed.) Historical Note, p. 694; § 7305, Code Commission Notes.) According to the Code Commission Notes for section 7305, the section was intended to eliminate the ambiguous definition of "distribution" in the Gas Tax Act. Under the Gas Tax Act, the word "distribution" was used in two senses: (1) as a mere sale, and (2) as a sale immediately preceded by a "production, etc." or an "importation" or an "acquisition after importation." (§ 7351, Code Commission Notes.) Since taxes under both the Gas Tax Act and the Fuel Tax Law were not intended to be levied on a mere sale, section 7305, according to the Code Commission Notes, was intended to define unequivocally "distribution" in the second sense noted above. (§§ 7305, 7351, Code Commission Notes.)

Section 7305(e) was added to section 7305 in 1948 in response to the 1947 amendment of section 7401. (At trial, the parties stipulated that the legislative history of § 7305(e) submitted by Al-Sal constituted the true and complete history of § 7305(e).) The 1947 amendment of section 7401— section 7401 sets forth the Fuel Tax Law exemptions—narrowed substantially the tax exemption that had been allowed regarding fuel distributions to the federal government. This amendment resulted in a substantial increase in Fuel Tax Law revenues, but it contained a loophole that needed closing. A large part of the transactions meant to be taxable under the section 7401 amendment were distributions made to the federal government for delivery on military reservations. Because the federal government had exclusive jurisdiction over these reservations, if the "sale" element completing the distributions took place on the reservations, California lacked the jurisdiction to tax them. To avoid this problem, the Board sponsored the enactment of section 7305(e). As explained by the Board's secretary, in a 1948 letter to then-Governor Warren, section 7305(e) "would mean that the taxable event would be the withdrawal of the gasoline from the bulk storage of the distributor (oil company) at some point outside of the Federal reservation

for the purpose of its sale on the reservation if the consummation of that purpose would not otherwise constitute a taxable distribution." This narrow interpretation was concurred in by the state Controller, the Legislative Counsel, the state Director of Public Works, the state Department of Finance, the Attorney General, and the Legislative Secretary.

Most significantly, the legislative bill adding section 7305(e)—Senate Bill No. 47—stated that section 7305(e) "is hereby declared to be the positive expression of a continuing legislative intent with respect to the construction of the Motor Vehicle Fuel License Tax Law ever since the enactment of that part of the Revenue and Taxation Code. The revision in the language of Section 7305 of the Revenue and Taxation Code made by this act is, accordingly, a clarification of the law and not a change therein." (Stats. 1948, ch. 36, § 2, p. 149, eff. Apr. 29, 1948.) We have seen that the Board's interpretation of section 7305(e) would engender a radical change in section 7305 contrary to this edict.

Of course, the Board is correct that section 7305(e) does not say "bulk storage." But we have seen the absurd results that could flow from an all-encompassing definition of "storage" in section 7305(e). To further support its position on the term "storage," the Board claims that section 7351.5, which defines the term "storing," provides the applicable definition for "storage" in section 7305(e). Unfortunately for the Board, however, section 7351.5 further undercuts the Board's position.

The section 7351.5 at issue (Stats. 1981, ch. 541, § 9, p. 2172; a new section 7351.5 with identical pertinent language was enacted in 1989) was a one-time tax levied in 1983 as a transition to a higher per gallon tax under the Fuel Tax Law. That section stated in subdivision (a) that "[f]or the privilege of storing for the purpose of sale or use . . . , fuel as to the distribution of which a license tax not exceeding seven cents . . . per gallon has been imposed under Section 7351, every person, except a duly licensed distributor [and the federal and state governments and subdivisions], owning 1,000 gallons or more . . . on January 1, 1983, shall pay a tax of two cents . . . for each gallon of the fuel . . . , if the license tax rate on that date is nine cents . . . per gallon." Subdivision (b) of section 7351.5 provided in pertinent part that "*[f]or the purposes of subdivision (a),* 'storing' includes the possession in a container of any kind . . . ." (Italics added.)

Contrary to the Board's argument, the term "storing" in section 7351.5 is expressly limited to that section. This limitation supports Al-Sal's argument that "storage" in section 7305(e) does not encompass storage in any kind of container but refers to storage in bulk, as set forth in the legislative history. If, as the Board suggests, "storing" is defined in section 7351.5 in its usual

sense, the express restriction of that term to section 7351.5 suggests that "storage" in section 7305(e) refers to a particular sense.

The Board also errs in arguing that the definitions of "service station" and "bulk plant" set forth in sections 7313 and 7314, respectively, mean that mere retail service stations are engaged in "storage" for purposes of the definition of distribution in section 7305(e). As stated in section 7313, " '[s]ervice station' means a place of business where motor vehicle fuel *is sold and delivered into the fuel tanks of motor vehicles*" (italics added); section 7314, a companion provision to section 7313, specifies that a "bulk plant" is "a place of business other than a service station where motor vehicle fuel *is stored for purpose of distribution of the fuel in bulk* at wholesale lots *and not offered for sale at retail* to consumers delivered into the fuel tanks of motor vehicles at such place of business." (Italics added; see also § 7308 [defining "broker" as a person, other than a distributor, dealing in motor vehicle fuel, but excepting therefrom a service station operator].) Sections 7313 and 7314 discount the notion that mere retail sales can constitute "distributions."[4]

After being confronted at trial with these expansive and radical implications of its interpretation of section 7305(e), the Board facilely countered that section 7305(e) applies only to licensed distributors. Indeed, the Board applied section 7305(e) to Al-Sal only during the time Al-Sal was a licensed distributor. The Board sets forth its "licensed distributor" qualification, however, without any citation to judicial authority, cognizable administra-

---

[4]At trial, the Board argued that sections 7313 and 7314 contemplate that a retail service station's underground tanks constitute "storage" tanks for purposes of section 7305(e) "distribution." Otherwise, the Board argued, section 7314 could simply have read "a place of business where motor vehicle fuel is stored for purpose of distribution of the fuel in bulk at wholesale lots." We note, however, that sections 7313 and 7314 were part of the same legislative package and must be read together. (Stats. 1965, ch. 2029, §§ 2-3, pp. 4601-4602.) The "service station" and "sale at retail" language is included in section 7314 to ensure that the concept of service station retail sales is distinguished from the concept of storage for purposes of distribution.

This raises another point not mentioned by the Board. Section 7314, subdivision (b) provides: " 'Bulk plant' does not include a storage facility from which motor vehicle fuel is supplied to a service station by fuel line or lines connected directly with service station dispensing pumps." If section 7314, subdivision (b), however, means that a retail service station's underground tanks constitute "storage" for section 7305(e) distribution purposes, we cannot think of a more roundabout way of expressing this concept.

Finally, section 7314 does not mean that "withdrawal . . . from storage" in section 7305(e) is necessarily limited to "bulk plant" storage. (See, e.g., § 7314, subd. (b); § 7305, subd. (f) [" 'consignment for sale' does not include the withdrawal of motor vehicle fuel from storage and the transfer of the fuel into storage at a bulk plant operated by an agent [of the distributor] . . . ."]) However, our previous analysis and the contrasting language in sections 7313 and 7314 demonstrate why the term "storage" in section 7305(e) cannot be all-encompassing.

tive authority, statutory context or legislative history. As aptly observed by the trial court, this qualification "seems to be conjured from thin air."

The Board's "licensed distributor" qualification of section 7305(e) highlights the fundamental conflict presented in this case. In essence, the Board claims the Fuel Tax Law applies to the *status* of being a distributor. Al-Sal, on the other hand, claims the tax is imposed upon the *act* of distributing. A look at the Fuel Tax Law's most basic provisions convinces us that Al-Sal's view is the correct one. Section 7305 defines the *activities* that constitute "distribution;" section 7306 defines "distributor" as a person engaging in the *activities* set forth in section 7305; finally, section 7351 imposes the Fuel Tax Law upon distributors for each gallon of fuel they *distribute*, "[f]or the privilege of *distributing* motor vehicle fuel." (Italics added.)

In this regard, a look at the practical realities of the disputed tax imposed on Al-Sal's retail sales of straight gasoline is also enlightening. The manner in which Al-Sal made these sales remained unchanged in the periods before, during, and after it held its distributor's license. But it was only during the period Al-Sal held the license—July 1, 1982, to January 31, 1985—that the company incurred the excess gallonage tax on these retail sales of gasoline. Al-Sal obtained the distributor's license for the singular purpose of blending and selling gasohol—the license had nothing to do with Al-Sal's straight gasoline sales. At the Board hearing in this case, a staff member of the Board provided the following summary of why someone who is a distributor for the narrow purpose of gasohol becomes a distributor for all purposes: ". . . once you become a distributor, [the statutory scheme] require[s] a distributor to report tax on a volumetric basis on all of his redistributions." To avoid the disputed tax, the Board's auditor advised Al-Sal simply to relinquish its distributor's license to a related entity, which Al-Sal did with the advised effect. Under these circumstances, it is clear the Board imposed the excess gallonage tax on Al-Sal's straight gasoline sales because of Al-Sal's *status* as a distributor and not because the company had engaged in *acts* of distribution regarding these sales. As we have seen, the Fuel Tax Law is imposed for the acts of distribution and not for the status of being a distributor. (See §§ 7305, 7306, 7351, 7354, 7356, 7356.5.)

Finally, we note the Board issued a "Tax Information" publication in December 1985, stating in pertinent part: "DISTRIBUTIONS OF COMMINGLED MOTOR VEHICLE FUELS. A person who blends gasohol from gasoline and alcohol is required to be registered with the Board of Equalization as a distributor under the Motor Vehicle Fuel License Tax Law. Blending includes the combining of gasoline and alcohol in the distributor's storage tank or the slush blending of gasohol in the cargo tank of its truck or its agent's truck. The distributor owes Motor Vehicle Fuel License Tax on the increase

in volume of motor vehicle fuel caused by the addition of alcohol to tax-paid gasoline." Although this publication cannot by itself estop the collection of a legally valid tax, it does provide some evidence of how the Board viewed the Fuel Tax Law's applicability in the gasohol-blend context.

We conclude that Al-Sal during the relevant period did not "redistribute" straight gasoline within the definition of "distribution" in section 7305(e), and therefore was not liable, on that basis, for the excess gallonage tax imposed under sections 7356 and 7356.5.[5]

### The Definition of "Distribution" in Section 7305 Governs the Term "Redistributes" in Sections 7356 and 7356.5

The Board argues, alternatively, that the term "redistributes" in sections 7356 and 7356.5 is to be read in its ordinary sense of placing in commerce and does not have the same meaning as the term "distribution" defined in section 7305. We disagree.

Section 7356 provides: "Any distributor or broker who acquires motor vehicle fuel from another distributor under a taxable distribution measured by the temperature corrected gallonage as provided in Section 7355, or by volumetric measure, and who redistributes the fuel is subject to the tax imposed by this part with respect to that gallonage redistributed which is in excess of the taxable measure of the gallonage acquired."

Section 7356.5 provides: "Any distributor or broker who acquires taxpaid motor vehicle fuel from another distributor or broker measured by the temperature corrected gallonage as provided in Section 7355, or by volumetric measure, and who redistributes the fuel is subject to the tax imposed by this part with respect to that gallonage redistributed which is in excess of the taxable measure of the gallonage acquired taxpaid. For the purposes of this section 'taxpaid' means the gallonage, either temperature corrected or volumetric, with respect to which the tax imposed by this part has been paid prior to acquisition by the distributor or broker."

Perhaps the simplest case against the Board's argument can be found in one of the Board's own regulations. In the California Code of Regulations, the Board defines "distribution" as an "initial distribution of motor vehicle fuel by a licensed distributor, or a redistribution by a licensed distributor or licensed broker of motor vehicle fuel acquired under a taxable distribution."

---

[5]The parties agree that the definitions of "distribution" set forth in subdivisions (a) through (d) of section 7305 do not provide any basis on which to impose the excess gallonage tax on Al-Sal's retail sales of straight gasoline.

(Cal. Code Regs., tit. 18, § 1121, subd. (a)(5); see Rev. & Tax. Code, § 8251.) Under this regulation, the terms "distribution" and "redistribution" are equated. Although mere labels may not "close the book" on this issue, moving past them does not help the Board either.

Chapter 1 of the Fuel Tax Law (§§ 7301-7315) sets forth the general provisions and definitions that guide the imposition of the tax, as set forth in chapter 2. (§§ 7351-7360.) As stated in section 7302, "[e]xcept where the context otherwise governs, the definitions given in [chapter 1] govern the construction of [the Fuel Tax Law]." "Distribution" is defined in section 7305 of chapter 1; the imposition of the excess gallonage tax on fuel that is redistributed is governed by sections 7356 and 7356.5 of chapter 2. There is nothing in the context of sections 7356 and 7356.5 that would otherwise govern the term "redistributes" so the definition of "distribution" set forth in section 7305 of chapter 1 applies.

Strong support for this view is found in section 7354. Prior to section 7356 being enacted, the predecessor statute to section 7354 read: "The license tax shall be imposed upon only one distribution of the same motor vehicle fuel." (§ 7354, 60 West's Ann. Rev. & Tax. Code (1987 ed.) Historical Note, p. 710].) When section 7356 was enacted in 1961, section 7354, as part of the same legislative package, was amended to read: "The license tax shall be imposed upon only one distribution of the same motor vehicle fuel, except as may otherwise be provided in [the Fuel Tax Law]." (Stats. 1961, ch. 1270, § 1 p. 3047.) In light of this statutory history, the term "distribution" in section 7354 is obviously linked with the term "redistributes" in sections 7356 and 7356.5.[6] Moreover, all of these sections are found in chapter 2, which governs the imposition of the Fuel Tax Law by imposing the tax "[f]or the privilege of distributing motor vehicle fuel." (§ 7351.) This context lends further credence to the view that "distribution" in section 7305 means the same thing as "redistributes" in sections 7356 and 7356.5.

The Code Commission Notes discussed before provide guidance again. (§§ 7305, 7351, Code Commission Notes.) According to those Notes, the Fuel Tax Law sought to clarify the ambiguous definition of "distribution" in the 1923 Gas Tax Act. Under the Gas Tax Act, the term "distribution" was used in two senses: (1) as a mere sale, and (2) as a sale preceded by a "producing, etc." or an "importation" or an "acquisition after importation" element. (§ 7351, Code Commission Notes.) According to these Code

---

[6]Although section 7356 was enacted in 1961 and section 7356.5 in 1978, the wording of the two sections regarding redistribution is identical and they will be treated the same for purposes of our analysis. The major difference between the two sections is that under section 7356 the subject fuel is acquired *during* the taxable distribution while under section 7356.5 the fuel is acquired *after* the taxable distribution.

Commission Notes, the Fuel Tax Law was designed to eliminate this confusion by defining "distribution" in the sense (2) mode. The Code Commission Notes to section 7351 further state that whenever the term "distribution" is used to mean a mere "sale" or "use, etc.," that specific term—sale, use, etc.—is employed. We are reluctant to disrupt this well-considered scheme of definitional precision by accepting the Board's position that the term "redistributes" in sections 7356 and 7356.5 has a broader meaning than the term "distribution" in section 7305.

The weakness of the Board's position is further demonstrated by analyzing the legal arguments in support of it. Initially, the Board argues that if "redistributes" in sections 7356 and 7356.5 has the same meaning as "distribution" in section 7305, the inclusion of "broker" in sections 7356 and 7356.5 is meaningless. A "broker" is defined as one who deals in motor vehicle fuel but who is not a distributor. (§ 7308.) Under Al-Sal's interpretation of sections 7356 and 7356.5, the Board argues, a broker is not subject to the tax specified in those sections unless he or she engages in an act of "redistribution" which is the same as an act of "distribution." If one engages in an act of distribution, however, he or she becomes a distributor and is no longer a broker. (See § 7306.) The Board claims this is the logical result of Al-Sal's interpretation.

The answer to this argument is found in the other statutory changes included in the legislative package that rewrote section 7356 in its present form. (Stats. 1967, ch. 1480, §§ 5, 12, 17, pp. 3469-3470.) Besides the changes to section 7356, that package included the addition of section 7485 and the rewriting of the second paragraph of section 7726. Section 7485 provides in pertinent part: "Any person who holds a valid broker's . . . license . . . and who is subject to the tax imposed by [the Fuel Tax Law] solely by reason of Section 7356 . . . shall not be required to obtain the distributor's license provided for in Section 7451." (Section 7451 provides in pertinent part: "Every person before becoming a distributor shall apply to the board for a license authorizing the person to engage in business as a distributor. A distributor's license shall be issued only to a person who is a distributor of motor vehicle fuel within the meaning of the word 'distribution' as defined in Section 7305, or who is an aircraft manufacturer, or certificated or licensed carrier by air . . . .") Section 7726 provides: "If any person becomes a distributor without first securing a license, the license tax, applicable penalties and interest, if any, become immediately due and payable on account of all motor vehicle fuel distributions made by him or her. [Rewritten second paragraph.] Except as provided in Section 7356 and paragraph (5) of subdivision (a) of Section 7401, a broker who acquires motor vehicle fuel with respect to which there has not been a distribution on which tax has been paid pursuant to this part, commingles any untaxed

product with tax-paid fuel and distributes the resultant product as motor vehicle fuel, or sells or otherwise distributes any untaxed product for resale or use as a motor vehicle fuel, shall be regarded as an unlicensed distributor of that gallonage of motor vehicle fuel or product distributed or in his or her possession which is in excess of his or her acquisition of motor vehicle fuel from distributions with respect to which the tax has been paid, and shall be subject to the provisions of this article as an unlicensed distributor of that excess fuel, unless he or she shall establish that the license tax has been paid with respect to all fuel sold or otherwise disposed of by him or her."

Accordingly, section 7485 exempts a broker from having to obtain a distributor's license under section 7451 if the broker is subject to the Fuel Tax Law solely because of section 7356; under section 7451, a distributor's license—for the purposes relevant here—is issued only to persons engaging in a "distribution" as defined in section 7305. In compatible fashion, section 7726 in effect exempts brokers engaging in section 7356 redistributions—who, as we have seen, are not required to have a distributor's license (§ 7485)—from the tax and penalties which are otherwise imposed upon unlicensed distributors. Consequently, but for the exemptions set forth in sections 7485 and 7726, a broker subject to the tax "solely by reason of Section 7356" would have to obtain a distributor's license under section 7451, and would be liable for taxes and penalties under section 7726 for not doing so. Because section 7451 states for our purposes that a distributor's license is issued only to a person "who is a distributor . . . within the meaning of the word 'distribution' as defined in Section 7305," it is clear that a broker who "redistributes" pursuant to section 7356 is engaged in an act of "distribution" as defined in section 7305. This conclusion is bolstered by again noting that this statutory scheme was enacted as part of the same legislative package. (Stats. 1967, ch. 1480, §§ 5, 12, 17, pp. 3469-3470.)[7] In light of the exceptions set forth in sections 7485 and 7726, the Board cannot argue successfully that if the term "redistributes" in sections 7356 and 7356.5 has the same meaning as the term "distribution" in section 7305, brokers who "redistribute" are necessarily distributors and therefore not brokers.

The statutes analyzed above also underscore the fact that the Fuel Tax Law is imposed for *acts* of distribution rather than the *status* of being a distributor. At their core, these statutes recognize that any person who engages in an act of distribution will be subjected to the tax under the Fuel Tax Law, unless he or she is specifically excepted therefrom.

---

[7]Section 7356.5, added in 1978, was not part of this 1967 legislative package and is not referenced in section 7485 or section 7726. Nevertheless, the language and purpose of section 7356.5 parallel that of section 7356 and a parallel legal analysis is appropriate. (See fn. 6, *ante.*)

The Board cites to three statutes to argue that a variance exists between the definition of the term "distribution" in section 7305 and the use of that term in the cited statutes. As we explain, this argument is not well taken.

The first statute cited by the Board is section 7355, subdivision (c).[8] The Board argues that "distribution" in section 7355 means something different from "distribution" in section 7305. That is not the case. Section 7355 sets forth the definition of "gallon" for purposes of measuring a taxable distribution. That is, section 7355 assumes that a taxable distribution has taken place and merely sets forth the methods by which the volume of fuel encompassed in that distribution will be measured. In light of this purpose, section 7355, subdivision (c), does not define a "distribution" as a *mere sale* to a purchaser who uses the fuel in off-highway exempt vehicles, as the Board contends; rather, subdivision (c) specifies that the temperature-corrected method of measure will be accepted for fuel distributed to such a purchaser.

The next statute cited by the Board is section 7726, the unlicensed distributor statute discussed previously.[9] Under section 7726, a broker who (1) acquires motor vehicle fuel that has not been subject to a taxable distribution, or (2) commingles any untaxed product with tax-paid fuel and distributes the mixture, or (3) sells or otherwise distributes any untaxed product for resale or use as a motor vehicle fuel, will be regarded as an

---

[8]Section 7355 provides: " 'Gallon' means the United States gallon of 231 cubic inches, without adjustment of the volumetric gallonage for temperature correction of the fuel distributed, except that temperature corrected gallonage to 60 degrees Fahrenheit as invoiced to the purchaser with settlement made on the same basis will be accepted as the gallonage distributed with respect to the following distributions: [¶] (a) To a distributor licensed under this part. [¶] (b) To any person when the distribution is exempt from tax as provided in Section 7401. [¶] (c) To a purchaser who uses the fuel exclusively for a purpose other than in motor vehicles operated upon the public highways of this state entitling him to a refund of the tax. [¶] (d) To the United States government or any agency or instrumentality thereof pursuant to a contract of sale requiring application of temperature correction. [¶] (e) To any person when the quantity distributed in any single delivery to a single location is 5,000 or more gallons and temperature correction is consistently applied to all those deliveries to the purchaser over a period of 12 or more consecutive months."

[9]Section 7726 provides: "If any person becomes a distributor without first securing a license, the license tax, applicable penalties and interest, if any, become immediately due and payable on account of all motor vehicle fuel distributions made by him or her. [¶] Except as provided in Section 7356 and paragraph (5) of subdivision (a) of Section 7401, a broker who acquires motor vehicle fuel with respect to which there has not been a distribution on which tax has been paid pursuant to this part, commingles any untaxed product with tax-paid fuel and distributes the resultant product as motor vehicle fuel, or sells or otherwise distributes any untaxed product for resale or use as motor vehicle fuel, shall be regarded as an unlicensed distributor of that gallonage of motor vehicle fuel or product distributed or in his or her possession which is in excess of his or her acquisition of motor vehicle fuel from distributions with respect to which the tax has been paid, and shall be subject to the provisions of this article as an unlicensed distributor of that excess fuel, unless he or she shall establish that the license tax has been paid with respect to all fuel sold or otherwise disposed of by him or her."

unlicensed distributor of the excess gallonage distributed or in his or her possession and will be subjected to the Fuel Tax Law and accompanying penalties. The Board contends that by characterizing the above activities as "distributions," the meaning of "distribution" in section 7726 is broader than the meaning of "distribution" in section 7305. As noted by Al-Sal, not so.

The "sales" and "distributions" of untaxed fuel described in section 7726 (see (2) and (3) immediately above) are encompassed within the definition of "distribution" set forth in section 7305, subdivision (d), which provides: "The receiving in this state by a licensed distributor of motor vehicle fuel with respect to which there has been no prior taxable distribution, or the receipt in this state by any person, other than a licensed distributor or licensed broker under the conditions set forth in paragraph (5) of subdivision (a) of Section 7401, of motor vehicle fuel with respect to which there has not been a prior distribution on which tax has been paid pursuant to this part, and the sale, donation, consignment for sale, barter, or use of the fuel in this state." Besides describing essentially the same activities regarding "sales" and "distributions" of untaxed fuel (see (2) and (3) above), both sections 7726 and 7305 contain the same exception regarding section 7401, subdivision (a)(5). (Sec. 7401, subd. (a)(5) states in pertinent part that "the receiving of motor vehicle fuel in this state from a licensed distributor and the sale and delivery of the fuel to the United States armed forces pursuant to this subdivision shall not constitute a broker or distributor under this part.")

There is one discrepancy between sections 7726 and 7305, however. Under section 7726, the tax can be imposed on a broker who *merely acquires* motor vehicle fuel which has not been subjected to a taxable distribution. (See (1) above.) The scheme under section 7305 contemplates *receipt* of untaxed fuel *and sale*. Nevertheless, section 7726 covers this point in a manner consistent with both section 7305 and the concept embodied in the Code Commission Notes to section 7351 that any definition of "distribution" outside the scope of section 7305 is to be set forth expressly. Under section 7726, the relevant broker is "regarded as an unlicensed distributor of that gallonage of motor vehicle fuel or product *distributed* [see (2) and (3) above, covering sales or distributions of untaxed product] *or in his or her possession* [see (1) above, covering the situation of mere acquisition]." (Italics added.) Accordingly, a broker's *mere acquisition* can be taxed as a "possession" in a manner distinguished from a section 7305 distribution, and the definition of distribution set forth in section 7305 is otherwise applicable to the activities specified in section 7726 (see (2) and (3) above).

Finally, the Board cites to section 7352 to argue that the mere act of a bailee converting fuel entrusted to him or her by a distributor constitutes a

"distribution," which is obviously a distribution different than that defined in section 7305.[10] The Board is mistaken. Section 7352 does not characterize a bailee's *mere* conversion as a distribution. Rather, the distribution delineated in section 7352 requires (1) the distributor's "production, etc." or "importation" *and* (2) the bailee's "conversion" for use or sale. Read in this manner, section 7352 is entirely consistent with section 7305, subdivisions (a) and (c). Section 7305, subdivision (a) defines "distribution" as a combination of a "producing" element and a "sale" or "use" element. Similarly, section 7305, subdivision (c) defines "distribution" as encompassing an "importing" element coupled with a "sale" or "use." As noted by Al-Sal, section 7352 does not create a new, less restrictive definition of "distribution." The statute's purpose is to ensure tax compliance by creating a presumption of distribution if motor vehicle fuel that has been "produced, etc." or "imported" is no longer in the distributor's possession. To prevent easy circumvention of the tax, section 7352 states this presumption cannot be overcome simply because the distributor's bailee, employee, or agent possesses the fuel and has supposedly converted it to his or her own use.

Not one of the three cited statutes, therefore, provides support for the Board's argument that the term "distribution" in section 7305 is used inconsistently in later sections of the Fuel Tax Law. In the end, had the Legislature intended sections 7356 and 7356.5 to apply whenever the fuel was again placed in commerce, it would have been a simple matter to say "sells, or otherwise disposes of" instead of the technical term "redistributes." (See, e.g., Stats. 1947, ch. 1564, § 1, p. 3213, regarding the language "makes sales or otherwise disposes of" in the original second paragraph of § 7726.) This choice of wording is even more significant when one realizes that the Fuel Tax Law is grounded on the term "distribution." (§§ 7305, 7306, 7351.)

In its opening brief, the Board raises an issue not raised below. It argues that an unfair windfall will accrue to Al-Sal unless the Board's interpretation of sections 7356 and 7356.5 is adopted. The argument is based on the

---

[10]Section 7352 provides: "For the purpose of the proper administration of this part and to prevent evasion of the license tax, unless the contrary is established, it shall be presumed that all motor vehicle fuel refined, manufactured, produced, blended, or compounded in this State or imported into this State and no longer in the possession of the distributor has been distributed. This presumption cannot be overcome by proof that the motor vehicle fuel has been converted to his own use by any person to whom the distributor has entrusted the control or possession of the fuel either as bailee, consignee, employee, or agent; provided, however, any such person causing a distribution by the act of converting to his own use any fuel so entrusted to him, as well as any other person receiving such fuel with the knowledge that it was so converted, shall be jointly and severally liable with the distributor for payment of the tax imposed upon such distribution, and all such persons shall be considered as distributors for the purpose of Chapter 5 (commencing at Section 7651) or 6 (commencing at Section 7851) of this part."

ground that Al-Sal is able to sell heat-expanded fuel, collect the tax on that expansion from Al-Sal customers, yet not have to remit the tax on that expansion to the state. Al-Sal claims this argument involves factual issues that need to be tried, and therefore this issue cannot be raised for the first time on appeal. To the extent the issue requires the resolution of factual matters, Al-Sal is correct. (*Adelson* v. *Hertz Rent-A-Car, supra,* 133 Cal.App.3d at pp. 225-226.) We also note the Board has not provided any authority for this argument and on that basis we need not address it. (See *Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

Nevertheless, a couple of legal points are worth noting regarding this issue. Although the Board is hot and bothered by Al-Sal's ability to sell tax-free a certain volume of fuel that has expanded in warm weather, no mention is made that the state reaps the opposite benefit in cold weather when the fuel contracts. In the cold weather situation, Al-Sal sells a lesser volume of fuel than the amount which has been taxed in the initial distribution. The real problem here is that the fuel volume comprising the taxable distribution is measured using a standard temperature of 60 degrees Fahrenheit (see § 7355), while the annual mean temperature in most of Southern California is above 60 degrees. (National Oceanic and Atmospheric Administration, vol. 93, No. 13 (National Climatic Data Center, Asheville, N.C.) 1989 Annual Climatological Data Summary, California, at p. 22.) Consequently, the Southern California seller reaps the benefit of the temperature-induced fluctuations in fuel volume more often than the state. We cannot help but wonder what the Board's position would be if most of the fuel sold in California were sold in a cold area like Truckee. In any event, the resolution of this problem lies not with this court but with the Legislature.

Furthermore, the Board's concern about an unfair windfall is a bit suspect given that mere retailers selling heat-expanded fuel do not have to pay the tax, only licensed distributors. The inequity of this position is dramatically illustrated here where Al-Sal's retail straight gasoline sales were conducted in exactly the same fashion before, during, and after Al-Sal held its distributor's license to blend and sell gasohol, but the gasoline sales were subject to the excess gallonage tax only during the period that Al-Sal held the license; this was so, even though Al-Sal's license had nothing to do with these straight gasoline sales, and these sales comprised 90 percent of Al-Sal's total sales during the time Al-Sal was a licensed distributor. In fact, the Board admits that one of its auditors advised Al-Sal merely to transfer the license to a related entity to avoid retail sales of straight gasoline being subjected to the excess gallonage tax, and that this advice was heeded and proved accurate. Finally, it must be recognized that Al-Sal is not escaping the Fuel Tax Law as applied to its straight gasoline sales. All of this

gasoline was previously taxed under the Fuel Tax Law when first distributed. (§§ 7351, 7354, 7355.)

DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Scotland, J., concurred.